FILED
U.S. DISTRICT COURT

| My Name | Jesse Majors |
| Address | 6649 South 5500 West |
| City, State, Zip | West Jordan, Utah 84081 |
| Phone | 801-360-6880 |
| E-mail | |

2011 JUL 14  P 4: 17

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

I am the   X Plaintiff
☐ Attorney for the Plaintiff and my Utah Bar number is _____

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JESSE ANNE MAJORS | ) |
| Plaintiff, | ) **MEMORANDUM SUPPORTING** |
| | ) **DENIAL OF DEFENDANTS'** |
| | ) **MOTION TO DISMISS** |
| vs. | ) |
| | ) |
| THOMAS JEFFERSON SCHOOL OF | ) Case No.  2:11cv00558 CW |
| LAW, a California Corporation, and | ) |
| RUDY HASL and JEFFREY JOSEPH and | ) Judge Clark Waddoups |
| BETH KRANSBERGER and ERIC | ) Magistrate Judge Samuel Alba |
| MITNICK and JULIE GARRETT and | ) |
| CLAIRE WRIGHT and JOY DELMAN | ) |
| and JULIE CROMER-YOUNG and | ) |
| ARNOLD ROSENBERG and JANE | ) |
| LARRINGTON and PATRICK MEYER | ) |
| and LISA FERREIRA and ANGELA | ) |
| BAYNE and JAN DAUSS and LISA | ) |
| CHIGOS and CATHERINE DEAN and | ) |
| ALL MEMBERS OF THE ETHICS | ) |
| COMMITTEE OF THOMAS | ) |
| JEFFERSON SCHOOL OF LAW 2006- | ) |
| 2011 | ) |
| Defendants. | ) |

## BACKGROUND

Defendant Thomas Jefferson School of Law submitted Motion to Dismiss alleging failure to

state a claim upon which relief may be granted, due to defects in Plaintiff's pleading, under Rule

12(b)(6) Fed. R. Civ. P.

11        Pursuant to Rule 8(a)(1) Fed. R. Civ. P., Plaintiff Jesse Anne Majors moves the court for

12    an Order Denying Defendants' Motion to Dismiss on the grounds that Plaintiff's pleading gives

13    Defendants sufficient notice and adequate information to allow it to formulate an answer,

14    meeting the standard set by *Bell Atlantic Corp. v. Twombly,* 660 U.S. 544, 570 (2007).

15                                    **LEGAL STANDARD**

16        While *Twombly*[1] is the current standard, aspects of *Conley v. Gibson,* 355 U.S. 41, 45-46

17    (1957) have not been ignored.  Plaintiff, relying on *Conley*[2], which states that, "a complaint

18    should not be dismissed for failure to state a claim unless it appears beyond doubt that the

19    plaintiff can prove no set of facts in support of his claim which would entitle him to relief",

20    argues her complaint should not be dismissed.  Plaintiff's failure to mention one of the elements

21    (which would of course have to be proven at *trial*) should not result in a successful FRCP

22    12(b)(6) Motion to Dismiss for Failure to State a Claim.

23        Additionally, Defendants claim that Plaintiff's pleading does not include enough facts for

24    the Defendants to defend themselves.  However, Plaintiff has noted who, what, where and what

25    happened in the "Nature of Action/Factual background" section of Plaintiff's "Amended

26    Complaint", which "allows the court to draw reasonable inference" of the Defendants' liability,

27    meeting the "plausibility" standard set forth in *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009)

28    (citing *Twombly*, 550 U.S. at 556).

29        More importantly, however, is that the Supreme Court reiterated in *Iqbal*[3], that, when

30    reviewing a motion filed under Fed. R. Civ. P. 12(b)(6), "the court must accept the factual

---

[1] *Bell Atlantic Corp. v. Twombly,* 660 U.S. 544 (2007).
[2] *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).
[3] *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009).

31  allegations of the non-moving party as true and draw all reasonable inferences in its favor."[4]

32      In Utah, courts have maintained a strong policy of allowing discovery to ensure fairness

33  and justice. The court in *Glacier Land Co., L.L.C. v. Claudia Klawe & Associates, L.L.C.,* 2006

34  UT App 516, 154 P.3d 852 (2006), noted that "there is a strong policy underlying the modern

35  rules of civil procedure that the 'instruments of discovery ... together with pretrial procedures

36  make a trial less a game of blindman's bluff and more a fair contest with the basic issues and

37  facts disclosed to the fullest practicable extent.' *United States v. Procter & Gamble Co.,* 356

38  U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958); *see also Roundy v. Staley,* 1999 UT App

39  229, ¶ 11, 984 P.2d 404 (plurality opinion) ("[T]he purpose of Utah's discovery rules [is to]

40  facilitat[e] fair trials with full disclosure of all relevant testimony and evidence.")."

41      Therefore, Plaintiff contends that because she has included enough facts to satisfy the

42  legal standards for initial pleadings and because pleadings are not meant to replace the discovery

43  stage of litigation,

44      Defendant's Motion to Dismiss should be denied.

## ARGUMENT

46      Because Defendants rely on *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) in arguing for

47  dismissal on the grounds Plaintiffs' allegations are "implausible", Plaintiff appends a modicum

48  of evidence to this Memorandum. Plaintiff has also enumerated the causes of action, matching

49  facts to elements, in response to Defendant's criticism in its Motion to Dismiss.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

---

[4] *Id.* See also *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *Christopher v. Harbury,* 536 U.S. 403, 406 (2002).

53          The basic elements for a breach of contract claim in Utah are: (1) existence of a

54   contract between Plaintiff and Defendant, (2) that Plaintiff did what the contract required

55   Plaintiff to do or that Plaintiff was excused from performing Plaintiff's contractual obligations,

56   (3) that Defendant breached the contract by not performing his obligations and (4) that Plaintiff

57   was damaged because Defendant breached the contract.[5]

58          Relevant to Plaintiff case, *Paladino v. Adelphi Univ.,* 89 A.D.2d 85, 92; 454 N.Y.S.2d

59   868, 873 (2d Dept. 1982) stated, "[I]f the Contract with the school were to provide for certain

60   specified services, such as for example, a designated number of hours of instruction, and the

61   school failed to meet its obligation, then a contract action with appropriate consequential

62   damages might be viable.".

63   **Offer and Acceptance, Formation of Contract.** Defendants offered Plaintiff LSAT Scholarship

64   to attend their law school.  Plaintiff accepted offer and paid requisite tuition to attend.  Plaintiff

65   attended Defendant Law School from the years 2005 to 2011.  Defendants offered additional law

66   school education and Plaintiff accepted these offers every semester she registered and paid

67   tuition.  In fact, Defendants made multiple offers of educational opportunities and job

68   opportunities outlined in their Mission Statement, Student Handbook and Dean's Message.

69   **Quasi-Contract.** Similar to Plaintiff case, Plaintiff refers to *Roach v. University of Utah, et al,*

70   968 F. Supp. 1446 D. Utah. C .Div., (1997) in which Plaintiff Roach asserts "a breach

71   of contract claim on the ground that the University of Utah Student Code constitutes a contract

72   between Roach and the University and that the University's failure to follow the Student Code

73   when it dismissed Roach from the CPTP and the MPEP constituted a breach of contract."

---

[5] *Bair v. Axiom Design, L.L.C.,* 2001 UT 20; 20 P.3d 388, 392 (2001).

74   Furthermore, "[w]here the existence of a contract is the point in issue and the evidence is

75   conflicting or admits of more than one inference, it is for the jury to determine whether the

76   contract did in fact exist." *Id.*

77        Every time Plaintiff would attend a class, there were implied offers that if she would

78   attend class and take the final exam in each class she attended, she would be granted a grade and

79   credit for the class.  Plaintiff accepted these offers by attending class, completing homework

80   assignments, and taking exams.  Plaintiff argues that Policies and Procedures outlined in the

81   Student Handbook and the Procedures outlined in the Student Handbook for Student

82   Organizations, each constitute a quasi-contract between Plaintiff and Defendants.

83   **Performance, Duty.** In *State v. Hunter,* 831 P.2d 1033 (Utah App. 1992), the court held that an

84   agreement, such as a housing agreement, between a university and the student, creates a contract

85   and a contractual duty to abide by that agreement.  They stated, "In fact, not only did university

86   officials have a right to maintain an educational atmosphere, they had a contractual *duty* to do so.

87   Paragraph 21 of the housing agreement provides the basis of such duty". *Id.*

88        Plaintiff contends that Defendants created self-imposed duties to follow the policies and

89   procedures in Defendant Student Handbook.  In addition, as will be noted below, Defendants

90   agreed to permit Plaintiff to graduate in exchange for Plaintiff completing certain steps in an

91   Ethics Proposal.

92   **Breach.** A party to a contract breaches the contract if [Plaintiff] fails to do what [Defendant]

93   promised to do in the contract.[6]

94        **Grievance Policy.** Plaintiff had a grievance and tried to follow the "grievance policy" as

---

[6] Restat 2d of Contracts § 235 (1981).

95   outlined in the Student Handbook.  When Defendants intentionally interfered with that process

96   and ignored her emails and gave her false information, Defendants breached their self-imposed

97   contractual duty to Plaintiff.

98         Multiple emails were sent to Defendant Lisa Chigos asking for her to initiate a

99   harassment claim against Defendant Lisa Ferreira, Defendant Rudy Hasl and Defendant Beth

100   Kransberger, but Lisa Chigos would respond that she was not the person that handled grievance

101   matters.

102         However, when Plaintiff asked Student Services who to contact to initiate a grievance,

103   Student Services confirmed that Lisa Chigos was the contact person to initiate the grievance.

104   Lisa Chigos further denied she was the correct person and said that Plaintiff needed to contact

105   Beth Kransberger who was Lisa Ferreira's supervisor.

106         When Plaintiff said that she wanted to make the complaint against Beth Kransberger,

107   Lisa Chigos referred Plaintiff to Rudy Hasl.  When Plaintiff wrote Lisa Chigos for the fourth

108   time that Plaintiff needed to make the harassment claim against Rudy Hasl as well, Lisa Chigos

109   brushed Plaintiff off and replied that there was no one else to assist Plaintiff.

110         By not adhering to the school's self-imposed contractual obligations to follow its own

111   Grievance Policy, Defendants breached their duty to perform and thus, is liable for a breach of

112   contract cause of action.

113         **Ethics Proposal.** Plaintiff followed every step outlined in ethics proposal.  This proposal

114   was considered a contract in that Plaintiff would write another directed study paper, attend 5

115   hours of legal citation training, attend 5 hours of MCLE Ethics Credits, and a note of this

116   proposal will be left in Plaintiff's file. Defendants agree that once Plaintiff has performed her

6

117 part of the proposal, Defendants will allow Plaintiff to remain as a student, grant Plaintiff a grade
118 on the directed study project and allow her to continue her studies toward graduation.

119    After Plaintiff completed the requirements of the proposal as best she could, Defendants
120 threatened her with expulsion from school. Plaintiff attempted to complete every step as
121 outlined in the proposal, including getting prior permission from the Ethics Committee of which
122 Professor Plaintiff wanted to work with, the topic they had agreed on, and the names of the
123 MCLE classes Plaintiff wished to take. The Ethics Committee never answered her.

124    For nearly a full year, Plaintiff's email and phone calls were ignored. When Plaintiff
125 realized she was getting nowhere, she sent a demand letter to multiple persons involved in the
126 process requesting that the entire proposal be expunged. This demand was also ignored.

127    Hence, Plaintiff felt she still had a duty to perform as reasonably she could, acting, in
128 fact, above and beyond what would normally be expected of a student in this situation by writing
129 another directed study paper with no supervision, no citation help, and no feedback to help guide
130 her through several drafts.

131    Plaintiff also paid for Ethics training and viewed podcasts of MCLE Training
132 Workshops, Pre-Approved by the ABA to gain 5 MCLE credits in Ethics. Plaintiff went one
133 step further and sent in her documented viewings for approval by the State Bar of California for
134 MCLE Credit in Ethics.

135    Because Defendants never responded to Plaintiff and Plaintiff more than satisfied her
136 duty to perform her portion of the Ethics Committee proposal and Defendants refused to grant
137 Plaintiff what was due her under the proposal, Defendants are liable for breach of contract.

7

383      attached to the Student Handbook as an exhibit).  Again, though, please be aware that if the Committee
384      finds that you committed an ethical violation at the conclusion of such a hearing, it could impose a harsher
385      penalty than it has proposed already."

386
387  A follow-up email from Claire Wright further perpetuated the coercion, "Just to clarify your

388  response, you won't be seeking a hearing in your case, right?"

389       An email from Dean Beth Kransberger helps to confirms allegations in Paragraph 10 of

390  Plaintiff's "Amended Complaint".[18]

391       There are numerous emails in which such behavior is confirmed.  (Plaintiff avers that

392  there is no much evidence to confirm allegations contained in this Memo that discovery and

393  litigation must be allowed.  There is no room in procedural processes to fully discuss the nature

394  of Plaintiff case.)

395       This type of behavior continued throughout Plaintiff's law school career.  The harassment

396  and intimidation was so pervasive and severe that Plaintiff's parents got involved.  Plaintiff's

397  father, Dwight Barrett, tried numerous times to facilitate the progress of Plaintiff's education and

398  get answers Plaintiff was never given.  Mr. Barrett was also ignored and treated with hostility.

399  **Sexual Harassment.**  Plaintiff was sexually harassed by Defendant Arnold Rosenberg

400  that resulted in creating a hostile educational environment.  According to Defendant's Student

401  Handbook, "Sex Offenses" section defines sexual assault as "any sexual contact with another

402  person that occurs without the consent of the victim or is offensive to the victim."  The sexual

403  assault occurred when Defendant Arnold Rosenberg fondled Plaintiff's hands as he threatened

404  to "have them forensically tested for paint).  According to *Harris v. L&L Wings, Inc.*, 132 F.3d

405  978, 980 (4th Cir. 1997), "sexual harassment can include stroking, patting, and massaging the

---

[18] "No one does anything at Jesse Majors request.  Please forward all her email requests on the non-academic side to me, and all academic related requests to Eric."

138       **Graduation Requirements.** As outlined in Defendant's Student Handbook, the

139   eligibility guidelines are guidelines determined by Defendant law school and overseen by the

140   State Bar of California.  Plaintiff completed all the requirements for graduation as outlined in the

141   Student Handbook, but the school is not allowing Plaintiff to graduate.  Plaintiff completed 86

142   hours of law study.  Plaintiff wrote several papers in upper division classes to satisfy the "Upper

143   Level Writing" requirement of Defendant law school.  Plaintiff maintained requisite GPA for

144   each class to be counted toward credit requirement.

145       Because Plaintiff met the graduation requirements outlined in Defendant Student

146   Handbook and Defendants refused to allow Plaintiff to graduate, Defendants are liable for breach

147   of contract.

148       **Student Organization.** During the ethics investigation, Plaintiff asked for and was

149   granted permission by Defendant Beth Kransberger to form a new student organization, based on

150   the Defendants Handbook for Student Organizations, not knowing Plaintiff's current GPA which

151   is an element for forming a new student organization.

152       Plaintiff followed every step in student organization process and Defendants Lisa Ferreira

153   and Julie Garrett allowed Plaintiff to perform every step in forming a new student organization.

154   In fact, both Julie Garrett and Lisa Ferreira were given a copy of the By-Laws and Constitution,

155   Position Description and Member List.  In addition, on February 14, 2010, almost *two weeks*

156   *after* Plaintiff sent an email to the Student Bar Association and Lisa Ferreira asking permission

157   to start the organization,[7] *and after* a follow-up email Plaintiff has sent to Lisa Ferreira, along

---

[7] Email to SBA: "Hello, SBA...I have talked with Defendant Lisa Ferreira about starting a new organization, one I am VERY enthusiastic about.  I would like to develop a charter for Thomas Jefferson School of Law ADLF, which is the Animal Legal Defense Fund.  Many colleges already have one and I have already started the process with Nicole Pollata about getting us our own chapter, but I need to send a school-wide email to encourage membership,

158   with a carbon copy to Julie Garrett, Rudy Hasl, Beth Kransberger, Eric Mitnick, and Chris

159   Paulos, advising Lisa of the new student organization Plaintiff was forming, Lisa Ferreira

160   confirmed she had received the information:

161         "I have received the information.  You will be hearing back from me with any questions as I am in charge
162         of the student organizations on the staff side".
163
164   If Plaintiff was not allowed to form a new student organization, Lisa Ferreira and Julie Garrett

165   had a duty to advise Plaintiff of such.  No such notice was given to Plaintiff.  However, after

166   Plaintiff had successfully formed the organization, Plaintiff was asked to resign and transfer what

167   work she had performed over to the organization, a new President and staff.

168         Because Plaintiff was given permission to form a new student organization and because

169   Defendants never advised Plaintiff differently while the student organization was in process of

170   being formed, Defendants breached their fiduciary duties to Plaintiff.

171         Hence, because Plaintiff and Defendants through written and oral communications

172   created contracts and because Defendants had fiduciary duty to Plaintiff to conform to their

173   contractual obligations and consequently, did not perform their duties, Defendants are liable for

174   breach of contract.

175         Plaintiff incorporates "Prayer for Relief" section of Plaintiff's "Amended Complaint" for

176   the amount of damages Plaintiff has suffered.

---

find officers, generate responses and that sort of thing.  I was told by Lisa that this sort of email needs to go through your department, so I am asking if that would be okay.  Here is my general idea, based on the by-laws and mission statement of the ADLF themselves.  Could you please generate an email about starting a local chapter and anyone interested in becoming an officer or just general interest can email me at majorsja@tjsl.edu?  Thank you so much!  I can't wait to get this going."

177   Plaintiff also incorporates Paragraphs 1, 2, 4 (especially lines 39-41), 5, 6 (especially

178 lines 55-57), 7, 8, 9, 10, 13 (especially lines 125-127), 15 (especially lines 136-140), and 16 of

179 Plaintiff's "Amended Complaint".

180          **SECOND CAUSE OF ACTION**
181       **VIOLATION OF CONSTITUTIONAL RIGHTS**
182
183   **Government Action.** In *Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 115

184 S.Ct. 961 U.S.N.Y. (1995), the court stated, "We have held once, in *Burton v. Wilmington*

185 *Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and said many times, that

186 actions of private entities can sometimes be regarded as governmental action for constitutional

187 purposes." The court also noted in *Lebron,* that close ties to the federal government, including

188 being overseen by government entities, furthering government objectives and appointment of a

189 private entity's board of directors can meet the definition of government action, thus making the

190 private entity as government actor.[8]

191   Defendant law school receives funds from the federal government to pay students'

192 tuition. Defendant law school receives funds from the federal government to reimburse students

193 for employment under Federal Work Study programs. In addition, Defendant's Student

194 Handbook states, "the eligibility guidelines are guidelines determined by Defendant law school

195 and overseen by the State Bar of California."

196   Thus, because Defendants receive money from the government, participate in federally

197 funded programs and are overseen by the State Bar of California, Defendants qualify as

198 government actors and can be liable for constitutional violations.

199 **Family Educational Rights and Privacy Act (FERPA).** Under the Family Educational and

---

[8]*Lebron v. National R.R. Passenger Corp.,* 513 U.S. 374, 115 S.Ct. 961 U.S.N.Y. (1995).

200    Privacy Act of 1974 (FERPA), students have a right to inspect their education records; request

201    the amendment of their education records to ensure that they are not inaccurate, misleading, or

202    otherwise in violation of the student's privacy or other rights; consent to disclosures of

203    personally identifiable information contained in their education records, except to the extent that

204    FERPA authorizes disclosure without consent; file with the U.S. Department of Education a

205    complaint concerning alleged failures by the school to comply with the requirements of FERPA;

206    and obtain a copy of the school's FERPA policy."

207          Plaintiff asked for a copy of her file, specifically with regards to the ethics investigation

208    taken against her, from Defendant Claire Wright, a Professor and Chair of the Ethics Committee

209    along with a carbon copy of Plaintiff's request sent to Eric Mitnick:

210          "I have still not received a copy of the ethics investigation documents and taped interview. Could you
211          please let me know when these will be available for me? This is, I believe, my third formal request for a
212          copy..."
213

214    Claire Wright refused to grant Plaintiff's request which is against federal law. (Claire Wright

215    also sent a carbon copy of her email to Eric Mitnick):

216          "I've only received one other request from you for the file in your case. ...It is not the normal practice of
217          the Ethics Committee to turn over its files to a student, and the Student Handbook (including the Student
218          Code of Conduct) does not refer to such a practice. Moreover, you have accepted the Committee's
219          proposed informal resolution of your case and the case is now closed. It is not clear to me what additional
220          information you would be seeking at this point in time or what your intended use of such information
221          would be".
222
223    Defendant Claire Wright lied about the information in the Student Handbook and it is against the

224    law for her to require the Plaintiff to divulge private information such as "what the information

225    [contained in a student's file] will be used for" before turning over the information.

226          Plaintiff again asked for a copy of her file in an email sent to Claire Wright along with a

227    carbon copy to Eric Mitnick:

228          "As for a copy of my file, it actually DOES say in the Student Handbook that I am entitled to a copy of my

11

229    file. The Student Handbook states, in the section titled, "LAW SCHOOL INSTRUCTIONAL POLICIES,
230    RULES & REGULATIONS", Under Section III. GENERAL ADMINISTRATIVE POLICIES and Section
231    K. Inspection of Student Records... I have already received a copy of my records from the Registrar's
232    Office, via a written petition, but the portions I have requested specifically from you were not in my file.
233    That's why I am having to request them from you directly.  I apologize for the inconvenience, but if you
234    could get those documents and the tape to me as soon as possible, I would appreciate it."
235
236        Plaintiff has received a copy of her records from Student Services, but it is incomplete.

237  Plaintiff received a copy of the taped "informal hearing" conducted by Defendants Joy Delman

238  and Julie Cromer-Young, but Plaintiff still has not received a full, complete copy of her student

239  records to this day. Thus, because Defendants have failed to grant Plaintiff a full and complete

240  copy of her Student Records, Defendants are liable for violation of federal law.

241  **Transcripts.** Plaintiff requested an official copy of her transcript and an unofficial copy of her

242  transcript to be sent to her.  Plaintiff requested this via the school's website,

243  https://myvillage.tjsl.edu/selfservice/home.aspx, via email to registrar@tjsl.edu , via email to

244  Kim Grennan (kimg@tjsl.edu) with the registrar's office, via fax, and via phone.

245       The "myvillage" website indicated that Plaintiff did not have access to the transcript.

246  The registrar never responded to Plaintiff email.

247       The fax was successfully sent, but no transcript was ever received.

248       Plaintiff also requested that official transcripts be sent to the Skadden Foundation, Equal

249  Justice Works, several employers and the State Bar of California.

250       Plaintiff received notification that she was denied a fellowship with Skadden Foundation

251  because her file was incomplete, indicating that they never received her transcript.  Plaintiff was

252  more than qualified to receive the fellowship and absent a transcript, Plaintiff lost out on large

253  sum of money.

254          Plaintiff paid $150.00 for the State Bar of California to perform an Evaluation of Law

255    Study Completed. In order for the State Bar of California to conduct the evaluation, transcripts

256    from every institution Plaintiff studied law needed to be sent to them. Plaintiff knows that no

257    transcript was ever sent to her or the State Bar because the State Bar of California mailed

258    Plaintiff a letter stating that when they receive Plaintiff's transcript from Defendant, they can

259    continue the evaluation. The State Bar of California has not received a transcript as of this date.

260          When Plaintiff called Defendant registrar office, Plaintiff spoke to Claudia Ferguson and

261    asked to get a transcript at that time. Claudia advised Plaintiff that there was something in

262    Plaintiff's file indicating that Claudia could not grant Plaintiff's request. Claudia advised

263    Plaintiff that Claudia had to "talk to Dean Mitnick first". When Plaintiff inquired why Claudia

264    could not send Plaintiff a transcript and why Claudia needed to talk to Dean Mitnick, Claudia did

265    not give a reason. After placing Plaintiff on hold, Plaintiff was told by Claudia that Plaintiff

266    would have to talk to Dean Mitnick first. As Plaintiff again asked why, Plaintiff was cold-

267    connected to Dean Mitnick's phone. There was no answer. Plaintiff left a message requesting a

268    transcript. No reply phone call or email was given.

269          In response to not receiving transcripts after multiple attempts, Plaintiff sent an email to

270    Eric Mitnick, Dean Rudy Hasl, Jeff Joseph and Claudia Ferguson with a one line request: "i

271    want to know why i was denied a transcript request". The only person that replied was Dean

272    Rudy Hasl and it was blatantly rude, unprofessional and did not answer Plaintiff's question.

273    Instead, Dean Rudy Hasl criticized Plaintiff and made derogatory remarks about her, never

274    bothering to answer Plaintiff's question:

275        "I have been waiting for some type of response to my notice to you that you were subject to immediate
276        dismissal for submitting a plagiarized paper in satisfaction of a prior ethics violation requirement. I am

13

277      concerned that you seem oblivious to the ethics transgression involved in submitting such a paper. Your
278      only response was to question who did the research to demonstrate that the paper was plagiarized. The only
279      other information that I received was that Gregg Miller, who had been supervising your work, was not
280      continued as an employee of the School. Not only will you not be able to graduate, but I suspect that no bar
281      admissions committee would permit you to take the bar examination or be qualified for admission. I am
282      sorry that our educational program did not instill within you the ethical sensitivity that is required by
283      someone who seeks to be a member of the bar. Not having heard from you on the merits of this incident, I
284      have no alternative but to implement an immediate suspension of your registration as a student."[9]
285
286      Plaintiff has still not received any transcript as of this date.

287      Because Defendants refused to give Plaintiff a complete and accurate copy of Plaintiff's

288 records and because Defendants refused to deliver transcripts to Plaintiff and other third party's

289 at Plaintiff's request, Defendants violated Plaintiff's constitutional rights under FERPA.[10]

290 **Pursuit of Livelihood.** The Fifth Amendment of the Constitution guarantees the pursuance of

291 life, liberty and property. Courts have decided that within the 'liberty' and 'property' concepts,

292 is the right to pursue a chosen profession, stating in *Stidham v. Tex. Comm'n on Private Sec.*, 418

293 F.3d 486, 491 (5th Cir. 2005), "The Supreme Court has said that 'the right to work for a living

294 in the common occupations of the community is of the very essence of the personal freedom

295 and opportunity that it was the purpose of the [Fourteenth]Amendment to secure[,]' and this

296 court has 'confirmed the principle that one has a constitutionally protected liberty interest

297 in pursuing a chosen occupation.'" Additionally, in *Becker v. Illinois Real Estate Admin. and*

298 *Disciplinary Bd.*, 884 F.2d 955, 957 (7th Cir. 1989), "Several professions have been recognized

299 as constituting 'common occupations.' These professions include an attorney."

300      Before Plaintiff went to law school, Plaintiff was gainfully employed since the age of 17.

301 Plaintiff did not have difficulty finding employment when there were periods of temporary

---

[9] Dean Defendant Defendant Rudy Hasl sent a carbon copy of this email to Kim Grennan, not originally privy to this
information. This email also contains false statements and threats which Plaintiff contends goes to the defamation
and violation of constitutional right to be free from harassment and creating a hostile educational environment
causes of action contained in Plaintiff's "Amended Pleading" and later sections of this Memo.
[10] Supra at 7.

302   unemployment during her transition between California and Utah.  Plaintiff has applied for over

303   100 jobs and has not been employed since being granted unemployment benefits

304   February 13, 2011.

305         Plaintiff incorporates Paragraph 1, 2, 5, 7, 9, 10, 11, 15 and 18 of Plaintiff's "Amended

306   Complaint" and Paragraphs "FERPA" and "Transcripts" of the "Violation of Constitutional

307   Rights" section of this Memo above.

308         Because Defendants have refused to release transcripts as requested and because

309   Defendants have maintained negative documents in her file, Defendants have unlawfully

310   hindered Plaintiff's career as an attorney and are thus, liable for violation of Plaintiff's

311   constitutional right to pursuit of livelihood.

312   **Gender, Age and Religion Discrimination.** Plaintiff complains that not only did Defendants

313   violate their self-imposed Anti-Discrimination Policy, but that Defendants violated Title IX of

314   the Education Amendments of 1972[11] , U.S. Code Title 42, Chapter 21[12] and Title VII of the

315   Civil Rights Act of 1964[13].

316         According to Title IX of the Education Amendments of 1972,[14] "Programs and activities

317   which receive federal funds must operate in a nondiscriminatory manner."  Defendant law school

318   receives funds from the federal government to pay students' tuition.  Defendant law school

---

[11] Title IX of the Education Amendments of 1972 states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."

[12] 42 U.S.C.A §1983 Generally-Civil Action for deprivation of rights "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" and 42 U.S.C. §2000 "Congress exercised constitutional power in enacting Civil Rights Act of 1964, declaring that public policy is to prohibit discrimination in public accommodations.

[13] 20 U.S.C.A. § 1681; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.

[14] Supra at 11.

319   receives funds from the federal government to reimburse student for employment under the

320   Defendant law school Federal Work Study programs.

321        In addition, Title 42, Chapter 21 of the U.S. Code[15] states that "discrimination against

322   persons based on age, disability, gender, race, national origin, and religion (among other things)

323   can occur in a number of settings -- including education, employment, access to businesses and

324   buildings, federal services, and more." The discrimination that Plaintiff complains of occurred

325   while Plaintiff attended Defendant law school, which is an educational institution.

326        **Religion.** Plaintiff argues that, according to *Christian Legal Soc. Chapter of the*

327   *University of California, Hastings College of the Law v. Martinez,* 130 S.Ct. 2971 (U.S. 2010),

328   "regardless of whether they are the product of secular or spiritual feeling, hateful or benign

329   motives, all acts of religious discrimination are equally covered." Hence, Plaintiff contends that

330   because Plaintiff is from Utah, a predominantly Mormon state, a discriminatory feeling based on

331   her religion was the motive that triggered the continued discriminatory actions Plaintiff

332   experienced during her attendance at Defendant law school.

333        For example, at orientation at Defendant law school, Dean Beth Kransberger announced

334   that she was a gay and lesbian rights activist. During conversations after orientation, Beth

335   Kransberger divulged that she was a lesbian. While Plaintiff agrees that this communication was

336   not directed at Plaintiff, the conversation made Plaintiff feel very uncomfortable about her

337   religion and argues that this type of communication is very inappropriate in the educational

338   context.

339        In addition, Plaintiff wrote an article for the school newspaper comparing aspects of Utah

---

[15] Supra at 12.

340   and California as observed through Plaintiff's eyes.  Plaintiff experienced "culture shock" and

341   that's what the article was about.  According to the Editor-In-Chief at the time[16], she was asked

342   by the Student Bar Association to not publish Plaintiff's article because some of Plaintiff's

343   comparisons were considered derogatory against California.  The article was published anyway.

344   However, after the article was published, the Plaintiff received rude and disparaging comments

345   regarding the article.

346          **Gender and Age.** During the "informal meeting" portion of an ethics investigation, Joy

347   Delman and Julie Cromer-Young verify Defendants unlawfully questioned Plaintiff about her

348   "mothering skills", asking Plaintiff "how she handles stress at her age and inquiring "how old"

349   Plaintiff is.  These questions are highly inappropriate and demonstrate the prima facie

350   discriminatory misconduct of the Defendants.

351          Plaintiff incorporates Paragraphs 1, 2, 3, 4, 5, 9, 10, 12, 13, 15 and 18 of Plaintiff's

352   "Amended Complaint".

353          **Harassment and Discrimination Resulting In Creation of Hostile Educational**

354   **Environment.**  The Affirmative Action and Equal Opportunity Department at Oregon Health &

355   Science University has defined a hostile educational environment as occurring when

356   "unwelcome verbal, non-verbal, or physical behavior of a prohibited nature is severe and

357   pervasive enough to unreasonably interfere with an employee's work or a student's learning, or

358   creates an intimidating, hostile, or offensive environment to a 'reasonable person.'"[17] The article

359   continues, "Prohibited discrimination and harassment generally carry a component of power

---

[16] Plaintiff cannot remember the individual's name at this time.
[17] *"AAEO Investigates Civil Rights Allegations",* http://www.ohsu.edu/aaeo/investigation/hostile_environment.html (last accessed July 13, 2011).

360    differential between individuals; therefore, a person who seems to acquiesce to discriminatory or

361    harassing conduct may still be considered a victim of prohibited harassment." *Id.*

362          In addition, according to Defendant law school Student Handbook, "Disruption of the

363    Educational Process" section, disruptions of the educational process are "Disruptions that

364    wrongfully interfere with the educational process may include, but are not limited to:

365    Harassment, threats, intimidation, or any other action, whether on or off campus, that

366    hinders a student from pursuing his or her education at the law school, or that hinders

367    any law school faculty or staff member from performing his or her functions at the law

368    school...Disrupting or impairing the classroom environment".

369          Plaintiff complains that the actions of defendants, created such a hostile educational

370    environment that Plaintiff had to take multiple leaves of absence, unnecessarily prolong her

371    graduation, attend multiple counseling sessions, increase medication for handling anxiety and

372    stress and caused medical problems that may not have otherwise occurred such as Hepatitis E

373    (due to an overdose of Tylenol Plaintiff took to reduce headaches while attending Defendant law

374    school) and congestive heart failure due to pregnancy complications (which began during Finals

375    week at Defendant law school).

376          Plaintiff has already mentioned in Plaintiff "Amended Complaint" the first instance of

377    sexual harassment inflicted upon her by Arnold Rosenberg. Because this incident was so severe,

378    Plaintiff was scared to voice her opinion or request a hearing when Plaintiff was falsely accused

379    of plagiarism. An email from Claire Wright of the Ethics Committee confirms the coercive

380    nature of the Defendants:

381          "Of course, you can still request a formal hearing in your case. As explained in the Committee's original
382          letter to you, the procedures of such a hearing are spelled out in the Student Code of Conduct (which is

18

406  shoulders." "This covers physical conduct such as unwelcome kissing, touching, patting,

407  pinching, rubbing against, stroking, fondling, grabbing, assault, cornering, or other physical

408  conduct of a sexual nature, or coerced sexual intercourse." *Id* at 980.

409      Not only did Plaintiff find Defendant Arnold Rosenberg's conduct sexual in nature,

410  nonconsensual, but extremely offensive. In fact, Plaintiff contends that Defendant Arnold

411  Rosenberg's behavior was meant to intimidate her into not making a formal complaint against

412  the male student who assaulted her in the parking lot so that Arnold Rosenberg could informally

413  resolve the situation by ordering Plaintiff to attend anger management classes in lieu of Arnold

414  Rosenberg having to perform a full investigation.[19]

415      Furthermore, Plaintiff's request to Defendant Human Resource Manager Lisa Chigos to

416  begin a harassment claim was ignored. Not only did Defendant Lisa Chigos and Defendant

417  Law School not follow their own policy for reporting violations of sexual offenses in Defendant

418  Law School Student Handbook, but that in *Doe v. University of Illinois,* 138 F.3d 653, 661 (7th

419  Cir. 1998), following the Supreme Court's analysis, stated that a "school's failure to respond

420  promptly to known sexual harassment is itself intentional discrimination based on sex.

421      Thus, because Defendant Law School is an educational institution and individual

422  Defendants are employees of said law school and because Defendants unlawfully questioned

423  Plaintiff regarding her age and mothering skills and because Defendants allowed sexual

---

[19] This type of sexual harassment is known as "quid pro quo" harassment. See *EEOC Policy Guidance on Sexual Harassment*, http:// www.eeoc.gov/docs/currentissues.html (concluding that a single instance of harassment can be enough to establish a Title IX violation). See generally *EEOC Policy Guidance on Current Issues of Sexual Harassment*, http:// www.eeoc.gov/docs/currentissues.html (outlining the EEOC's sexual harassment policy) (last modified Mar. 19, 1990) (last accessed July 14, 2011).

424   harassment to go unanswered for, Defendants are liable for gender and age discrimination,

425   sexual harassment and creation of hostile education environment under constitutional laws.

426                          **FOURTH CAUSE OF ACTION**
427   **INTENTIONAL INFLICTION OF MENTAL ANGUISH AND EMOTIONAL**
428                                  **DISTRESS**
429            The tort of intentional infliction of emotional distress has four elements: (1) the defendant

430   must act intentionally or recklessly; (2) the defendant's conduct must be extreme and outrageous;

431   and (3) the conduct must be the cause (4) of severe emotional distress.[20]

432            Plaintiff contends that defendants knew that Plaintiff was trying to fulfill her obligations

433   under the information resolution to the Ethics Violation because Plaintiff sent multiple emails

434   that were ignored. There was no way for the Defendants to justify not answering Plaintiff's

435   email because Plaintiff sent the emails to multiple Defendants, Plaintiff's email preferences were

436   set to notify Plaintiff that the email was successfully sent and Plaintiff's name was her email

437   address.

438            Furthermore, Plaintiff's parents sent emails and they were also ignored. For over 1 ½

439   years, no progress was made on Plaintiff's resolution, but not due to Plaintiff's lack of trying.

440   Ignorance of Plaintiff for that long constitutes extreme and outrageous conduct, especially for an

441   educational, professional institution that Thomas Jefferson School of Law claims to be. All the

442   members of the Ethics Committee and other Defendants are Professors and/or Attorneys at one

443   time. They are held to a higher standard of professionalism so their conduct is especially

444   egregious. Not only did this cause Plaintiff extreme emotional distress, but her family felt the

445   effects as well. All their lives were placed on hold due to the Defendants actions.

---

[20]  Restat 2d of Torts, § 46

21

446        Plaintiff emailed every defendant multiple times, following up ignored emails with a

447    phone call and voice message if no one answered.  Plaintiff contends that because multiple

448    defendants were emailed and multiple emails were sent, followed by phone calls, most of which

449    were not responded to that an intentional act, albeit negligently, to inflict emotional distress on

450    Plaintiff was the motive for the non-response.  Plaintiff also contends that this created an

451    extremely hostile educational environment.

452        Plaintiff was required under the Ethics Proposal to obtain prior approval from the Ethics

453    committee before attending Ethics training and before beginning work on the additional directed

454    study project.  However, not only did Plaintiff request permission to work with Professor Gregg

455    Miller on the project, but Professor Gregg Miller, did also.  Plaintiff's request to complete the

456    requisite ethics training via podcasts, and/or online went unanswered.  Plaintiff's requests were

457    ignored for so long, that the semester ended and the options to attend ethics training and work

458    with Professor Gregg Miller were no longer an option.

459        While Defendant Dean Defendant Rudy Hasl claimed that Plaintiff was expelled from

460    Defendant law school, this did not happen.  Defendant Dean Defendant Rudy Hasl threatened

461    Plaintiff on at least two occasions that this would happen, but Plaintiff was allowed to register

462    for classes after the first threat and Plaintiff continued to communicate with Defendants after

463    second threat.  Plaintiff was never formally expelled; only threatened with expulsion.

464        Plaintiff incorporates "Breach of Contract" and "Defamation" sections of this Memo.

465        Plaintiff incorporates Paragraphs 4, 5 (lines 44-47), 7, 9 (especially noting portion where

466    Dean Beth Kransberger ran away from Plaintiff showing intent on part of Defendant), 10, 12, 14,

467    15 and 17 of Plaintiff's "Amended Complaint".

468   Plaintiff adds to Paragraph 8 of Plaintiff's "Amended Complaint" in that Defendant

469   Claire Wright asked Plaintiff specifically to notify her within a week if Professor Joy Delman or

470   Professor Julie Cromer-Young did not notify Plaintiff of date of informal hearing.  However,

471   when Plaintiff complied with Defendant Claire Wright's request, Defendant Claire Wright sent

472   Plaintiff a derogatory email implying that Plaintiff was being unnecessarily impatient and rude.

473   Plaintiff adds to Paragraph 9 of Plaintiff's "Amended Complaint" that a faculty secretary

474   to the dean of a law school would most likely not ignore requests from students to meet with said

475   dean.  However, Defendant Jan Dauss did exactly that.  Plaintiff sent Defendant Jan Dauss

476   multiple emails requesting an appointment to meet with Defendant Dean Rudy Hasl, including in

477   the body of the email Plaintiff's schedule and available times for an appointment.  Plaintiff was

478   never granted an appointment and several of Plaintiff's emails were left unanswered.

479   Because Defendants continued throughout Plaintiff's law school career to intentionally

480   mistreat her, threaten her and harass her, and ignore her,including allowing sexual harassment to

481   go unanswered for, and because Defendants coerced Plaintiff into accepting resolutions to ethics

482   violations she did not commit and because Defendants' conduct caused Plaintiff's family and

483   self mental anguish, Defendants are liable for intentional infliction of emotional distress.

484
485

### FIFTH CAUSE OF ACTION
### DEFAMATION

486

487   The tort of defamation includes both libel and slander.  Basically, any statement, whether

488   written or oral, that injures a party's reputation can be considered defamation.[21]  However, to

489   establish a prima facie case of defamation, four elements must be proven: (1) a false statement,

490   (2) publication or communication of that statement to a third party, (3) negligence or intent on

---

[21] See, e.g. *Buckley v. Fitzsimmons,* 509 U.S. 259 (1993)

491    the part of the person making the statement and (4) some harm caused to the subject of the

492    statement.

493         Dean Rudy Hasl emailed Plaintiff, which he carbon copied to Eric Mitnick, Jeff Joseph

494    and Kim Grennan false statements, including the statement that Plaintiff never responded to him.

495    Kim Grennan was not privy to this information. In the initial email requesting why Plaintiff was

496    denied a transcript, the email was not sent to Kim Grennan. In fact, not only did Plaintiff

497    respond to him in several emails, his parents did, also, constituting approximately ten emails.

498         Defendant Claire Wright stated she never received emails from Plaintiff, but if that were

499    true, it is inconceivable that Defendant Claire Wright would have received only one email from

500    Plaintiff. Furthermore, if Plaintiff's emails were incidentally forwarded to Defendant Claire

501    Wright's spam folder or trash, it is Defendant Claire Wright's responsibility to check her email

502    to maintain her duty to her students.[22] Also, it is unlikely that Defendant Claire Wright would

503    not have received Plaintiff email as Defendant Claire Wright claimed and not recognized it as

504    coming from Plaintiff as Plaintiff's name is the main part of Plaintiff email address:

505    "jessemajors@netscape.com."

506         Defendant Jeff Joseph notified Plaintiff via email that he would be asking Eric Mitnick to

507    look over Plaintiff's second directed study paper. This was not done. In fact, Defendant Jeff

508    Joseph instead forwarded Plaintiff's paper to Defendant Catherine Dean. Catherine Dean was

509    not given permission by Plaintiff to review her paper and was not privileged to this information

510    because she was not a party involved in the Ethics investigation. Catherine Dean reviewed

511    Plaintiff's paper for legal citation errors, but to this date, even after Plaintiff requested to know

---

[22] See Breach of Contract section of this Memo citing that professors have a contractual duty to their students to adhere to the policies and procedures of the Student Handbook.

512   who Catherine Dean was and what affiliation she had with Defendant Law School, Plaintiff does

513   not know who Catherine Dean is.  Catherine Dean, if affiliated with the law school, has now

514   been unlawfully informed of Plaintiff's alleged plagiarism, thus harming Plaintiff's reputation.

515   　　　　In Defendants' Memorandum Supporting Motion to Dismiss, it stated that Plaintiff was

516   expelled from Defendant Law School, which is false. The only way that Defendants Attorney,

517   Robert Wilde, would have made that statement is if he was told that by one of the defendants.

518   　　　　Thus, because false statements that Plaintiff has been expelled from school, that Plaintiff

519   is guilty of plagiarism and because Robert Wilde, Kim Grennan and Catherine Dean are third

520   parties not given permission by Plaintiff access to personal information and because the

521   statements were volitionally published in emails and legal documents, harming Plaintiff's

522   reputation to key law school personnel, Defendants are liable for defamation.

523   　　　　Plaintiff incorporates Paragraphs 2, 7, 10 (lines 91-98), 12, and 14 of Plaintiff's

524   "Amended Complaint".

525   　　　　Plaintiff also incorporates Violation of Constitutional Rights, "Transcripts" and "Pursuit

526   of Livelihood" sections of this Memo.

527   　　　**RESPONSE TO DEFENDANTS "DEFECTS IN PLEADING" SECTION OF**
528   　　　**DEFENDANTS MEMORANDUM SUPPORTING MOTION TO DISMISS**
529
530   **Crimes.** Torts, such as intentional infliction of emotional distress and defamation, noted above,

531   are defined in Restatement of Torts (Second) Section 46 as:

532   　　　　"civil wrongs recognized by law as grounds for a lawsuit. These wrongs result in an injury or harm
533   　　　　constituting the basis for a claim by the injured party. While some torts are also crimes punishable with
534   　　　　imprisonment, the primary aim of tort law is to provide relief for the damages incurred and deter others
535   　　　　from committing the same harms.  The injured person may sue for an injunction to prevent the continuation
536   　　　　of the tortious conduct or for monetary damages."
537
538   Plaintiff has enumerated intentional infliction of emotional distress and other torts, which qualify

539   as civil actions, above.

540   **Constitutional Violations.** Please see "Violation of Constitutional Rights" section of this

541   Memo.

542   **Defamation.** Please see "Defamation" section of this Memo.

543   **Professional and Ethical Violations.** Plaintiff did not mean to imply that professional and

544   ethical violations were separate causes of action.  Plaintiff apologizes and asks Defendants and

545   the Court to disregard that implication.

546   **Other Pleading.** Please see "Intentional Infliction of Emotional Distress", and "General

547   Harassment" sections of this Memo.

548   **Exhaustion of Any Related Administrative Remedies.** Please incorporate to argument below,

549   "Breach of Contract", "Sexual Harassment" and "Violation of Constitutional Rights" sections of

550   this Memo.

551          Plaintiff followed and/or tried to follow the policies and procedures outlined in

552   Defendant's Student Handbook for every cause of action Plaintiff asserts.  In fact, Plaintiff was

553   forced to involve General Counsel Defendant Jeff Joseph in order for certain policies and

554   procedures to be followed and no longer ignored.  Plaintiff tried to get the cooperation of nearly

555   every Dean of the law school, including Dean Eric Mitnick, Dean Beth Kransberger, and Dean

556   Rudy Hasl, Human Resource Department Representative Defendant Lisa Chigos, Student

557   Services Advisors Lisa Ferreira and Angela Bayne, Head of the Ethics Committee Claire Wright,

558   SBA President Chris Paulos and later SBA President Jeremy Evans.[23]

---

[23] Jeremy Evans met with Dean Rudy Hasl to assist me in resolving our disputes and was told "to not get involved." Email from Jeremy Evans: "After speaking with the Deans today, I was told not to get involved and that Dean Hasl was handling the situation we discussed".

559        No policy or procedure was ever fully complied with.

560        However, Plaintiff did not complain about every negative incident that occurred against

561    her.  In some instances, Plaintiff was intimidated into not doing so.  In others, Plaintiff, mentally

562    exhausted and emotional drained, gave up.  In even others, Plaintiff was so frustrated and upset

563    that Plaintiff's family had to get involved.

564        The most significant example of Plaintiff exhausting all administrative remedies was

565    when she tried to avoid litigation by requesting the State Bar of California to perform an

566    "Evaluation of Law Study Completed".  As noted above, in the Violation of Constitutional

567    Rights, "Transcripts" section, Defendants prevented that remedy from taking place.  Thus,

568    because Defendants are the contact persons responsible for seeing that policies and procedures

569    outlined in Defendant Law School Student Handbook are followed and progress accordingly,

570    and because Defendants hindered Plaintiff ability to possibly avoid litigation through an alternate

571    remedy,

572        Plaintiff fulfilled her obligation to exhaust any available administrative remedies.[24]

573                                    **CONCLUSION**

574        Because Plaintiff gave Defendants general notice of the claims against them, including

575    adequate facts to formulate an answer, Plaintiff meets the legal standard required of Pleadings

576    under Rule 8(a)(1) Fed. R. Civ. P.

577        Additionally, because Plaintiff also addressed Defendant's criticism by enumerating

578    Plaintiff causes of action, matching facts to elements of each cause of action, and adding a

---

[24] *See* Restatement (Second) of Torts § 918, comment c (tort victim "is not barred from full recovery by the fact that it would have been reasonable for him to make expenditures or subject himself to pain or risk; it is only when he is unreasonable in refusing or failing to take action to prevent further loss that his damages are curtailed").

579    modicum of facts to this Memo, Plaintiff has met the requirements to permit Plaintiff to proceed

580    to discovery and trial phases of litigation.

581         Therefore, Defendants Motion to Dismiss should be

582

583              DENIED.

584      Accordingly, Plaintiff Jesse Anne Majors reserves the right to amend this motion and

585    memorandum in any respect as motion practice and discovery proceed in this matter.

586   Dated this 14th day of July, 2011.

589         Jesse Anne Majors
590         Pro Se

Delivery Certificate

I hereby certify that I caused a true and correct copy of the foregoing Motion to be

served by the method(s) indicated below and addressed to the following on this

14th day of July, 2011.


ROBERT H. WILDE #3466
BRUCE M. FRANSON #10792
ROBERT H. WILDE, ATTORNEY AT LAW, P.C.
935 East South Union Avenue Suite D-102
Midvale, Utah 84047
Telephone: (801) 255-4774
Fax: (801) 566-5202
bob@rhwildelaw.com
*Attorneys for Defendant Thomas Jefferson School of Law*

Delivered:
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
( x ) E-mail
( ) CM/ECF Posting


DATED this 14th day of July, 2011.

Jesse A. Majors
Pro Se